**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

CHOI'S BEER SHOP, LLC and ABRAMOFF      :
LAW OFFICES, on behalf of themselves and    :
all others similarly situated,      :
     :
                Plaintiffs,      :        CIVIL ACTION NO.
     :
v.      :
     :      _____
PNC MERCHANT SERVICES COMPANY, L.P., :      **Jury Trial Demanded**
     :
                Defendant.      :
-------------------------------------------------------------x

## CLASS ACTION COMPLAINT

     COME NOW Plaintiffs Choi's Beer Shop, LLC and Abramoff Law Offices, individually

and on behalf of the classes of persons and entities preliminarily defined below, and file this their

Class Action Complaint, based on personal knowledge, investigation of counsel, and information

and belief.

## INTRODUCTION

     1.      For years, PNC Merchant Services Company, L.P. ("Defendant" or "Merchant

Services") and its affiliates have engaged in a scheme through which it overbills its customers.

Indeed, once merchants are locked into long-term contracts, Defendant assesses unanticipated

and excessive fees and deliberately obscures and hides the upcharges so that merchants cannot

reasonably detect that they have been overbilled.

     2.      Much of the harm is initially attributable to deception by Defendant's sales agents

during the contracting process. These sales agents, with the full knowledge and encouragement

of Defendant's management, seek to enroll merchants by every trick in the book, including by

failing to disclose fee practices they know will occur and outright lying about fine print

contractual terms. Agents earn substantial commission income and bonuses by doing so.

3.      Once merchants are enrolled, Defendant endeavors to cover up such frauds by blocking merchants from receiving itemized monthly statements.  This practice has two effects: it obscures Defendant's upcharges and blocks merchants from complaining.

4.      Those "squeaky wheel" merchants that are vigilant enough to demand itemized monthly statements still have a difficult time uncovering Defendant's scheme based on the deceptive manner in which Defendant disguises certain overcharges, such as annual fees.  Even if merchants discover the overcharges, they are typically unable to obtain any relief.  Defendant instructs its sales agents and customer service department to refuse refunds in most cases.

5.      Merchants that refuse to accept the overbilling and seek to cancel are forced to pay excessive early termination penalties that often exceed amounts they would otherwise pay if they fulfilled the remaining months on their contract's term.[1]  Merchants are thus put to a Hobson's Choice – accept the overbilling or cancel and pay massive termination fees.

6.      These allegations are not based on speculation but have been prepared following a thorough investigation of counsel, including conversations with many of Defendant's victims, several industry experts, and multiple former employees of Defendant.

7.      Plaintiffs bring this action against Defendant for engaging in this scheme and the resulting breaches of contract and applicable New York law.

## THE PAYMENT PROCESSING INDUSTRY

8.      In today's business world, the vast majority of merchants must accept payment for goods and services via credit and debit cards to stay competitive in the marketplace.  In order to accept this method of payment, the merchant must utilize a payment processing service.  As

---

[1] Defendant has recently adopted a more lenient termination policy.  Now it allows customers to terminate without penalty.  But this is only an internal policy – not a contract change – and it is not often communicated to customers.  Many of Defendant's representatives continue to misrepresent the policy to keep merchants from leaving.

used throughout this Class Action Complaint, the word "merchant" should be taken to mean any person or entity that accepts credit or debit cards for payments. This includes non-profits, schools, churches, government agencies, individuals, and many persons or entities that are not traditional businesses. All are subject to the same improper treatment by Defendant.

9. Merchants like Plaintiffs rely on companies like Defendant to provide the critical payment processing service in accordance with fair and transparent terms. Indeed, for many merchants, fees for card processing services are likely to be the third highest expense following labor and product costs. Even for a very small business, these fees can easily exceed $100 per month.

10. The card processing system can be extremely difficult to understand, with many involved parties. For instance, in addition to the merchant who receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

(a). <u>The Card Issuer</u> – the company that issued the credit or debit card to the customer, which is typically a bank such as Chase, Bank of America, or Defendant's corporate affiliate PNC Bank, and which receives a fee whenever a customer uses one its cards for a transaction. These companies receive fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.10/transaction). There are hundreds of different card types and the fee varies based on the type of card used. For example, rewards credit cards command a higher fee than a card with no rewards program. The fees paid to the issuing banks are generally known as "interchange fees." Because the card issuers must be members of the Visa, MasterCard, and Discover payment networks – which set interchange rates

for each card type and require all member banks to adhere to them – the interchange rates charged by each card issuer is the same.

(b).   <u>The Card Network</u> – the card networks (i.e., Visa, MasterCard, and Discover) establish and publish interchange fees applicable to each type of card in their system. The card networks charge additional per transaction fees, such as access fees.  By way of example, Visa assesses an access fee known as the "APF" ("Acquirer Processing Fee"), which is currently $0.0195 per credit card transaction and $0.0155 per debit card transaction, and MasterCard charges an access fee known as the "NABU" ("Network Access Brand Usage") fee, which is $0.195 per any card transaction.  The card networks also charge various additional fees depending on the merchant and type of transaction.  These additional fees are generally known as "assessments."   The fees established by the card networks (like the interchange fees) apply universally and are not subject to negotiation no matter who the customer, merchant, or processor is.  No entity aside from the card networks has the authority to modify these fees.

(c).   <u>The Payment Processor</u> – this is the entity that actually processes the payment and ensures that whenever a merchant receives payment for an item or service with a credit or debit card, (i) the customer's card account is debited and the merchant's bank account is credited, (ii) the merchant is assessed all applicable fees, and (iii) such fees are distributed to the proper parties.   First Data Merchant Services Corporation ("First Data"), which co-owns Defendant with PNC Bank, N.A. ("PNC Bank"), serves as payment processor for all of Defendant's customers.  In this way, more of the revenues and profits from customer transactions stay with Defendant and its owners than is often the case.

(d).   <u>The Member Bank</u> – only banks such as PNC Bank may be members of card networks.   These member banks "sponsor" payment processors so they may process

transactions through the card networks.  Unsurprisingly, Defendant works with PNC Bank as its member bank thus, once again, allowing more of the revenue earned from customers to stay under the PNC-First Data corporate umbrellas, and increasing group profits.

      (e).    <u>The Merchant Acquirer</u> – this is the company that markets the payment processor's services to merchants.  Merchant acquirers essentially act as a "middle man" between merchants and payment processors.  They enroll merchants in payment processing services and often provide customer support.  Merchant acquirers usually work with independent agents or companies, sometimes known as Independent Sales Organizations (ISOs) or Member Service Providers (MSPs), which sign up merchants.  The merchant acquirer then pays the ISO/MSP based on a percentage of the processing fees obtained from "their" merchants.  Defendant is a merchant acquirer but also signs up merchants directly, and so qualifies as an ISO/MSP as well.  Once again, because customer revenues are shared among Defendant, PNC, and First Data, an inordinate amount of revenue and profit is kept "in house."

11.    The number of involved parties and moving pieces can make it difficult for merchants to understand what fees are assessed for each transaction and how they are calculated.  Merchants thus rely on merchant acquirers to explain on the front end of their relationship exactly what fees will be charged and to provide detailed itemized statements showing the fees that are charged.

12.    Unfortunately, some merchant acquirers exploit this position of power.  They induce merchants like Plaintiffs to execute standardized agreements that prominently disclose fees that have been discussed and agreed-upon.  However, all the while, the merchant acquirer knows that the merchant is going to be flooded with additional fees that either were never

disclosed in the standardized agreements or were concealed in the fine print and never brought to the merchant's attention.

13.     Defendant employs aggressive sales tactics to institute just such a scheme. Defendant knows full well that if its agents disclosed its true practices – including that Defendant will (a) add fees or mark-up existing fees without proper notice and in bad faith, (b) attempt to prevent merchants from discovering its overbilling, (c) refuse to provide refunds of improper fees, and (d) force merchants to pay more to terminate than stay in the deal – merchants would never agree to do business with Defendant.

14.     This case challenges the nature and amount of the fees that Defendant imposes on its customers in the below-defined class and seeks monetary damages, restitution, declaratory relief, and injunctive relief.

## PARTIES

15.     Plaintiff Choi's Beer Shop, LLC ("Choi's LLC") is a small, family-owned-and-operated market in Philadelphia that sells beer and sandwiches made to order.  Choi's LLC has been a customer of Defendant since July 2017.

16.     Plaintiff Abramoff Law Offices ("Abramoff") is a solo practitioner law office that specializes in divorce and family law.  Abramoff is a DBA of Bonnie Abramoff Schmalzer and is located in Germantown, Wisconsin.  Abramoff has been a customer of Defendant since August 2014.

17.     Defendant Merchant Services is a Delaware limited partnership that is co-owned by PNC Bank and First Data Corporation.  PNC Bank is the sixth largest retail bank in the United States, with over $370 billion in assets.  First Data is the country's largest payment

processor.  Defendant was formed in 1996 and has been incredibly successful for its two partners.

18.     Merchant Services did not grow rapidly until 2005.  After nine years of operation, the company had only 25,000 customers.  In 2005, the decision was made to make Merchant Services a bigger sales focus at PNC Bank.  The Bank bought an additional 20 percent of the company from First Data, taking the ownership percentages from 60 percent for First Data and 40 percent for PNC to 60 percent for PNC Bank and 40 percent for First Data.  The Bank was reorganized to make Merchant Services "a core product offering."

19.     The number of accounts grew rapidly thereafter.  Merchant Services went from having a shrinking number of clients in 2005 to growing at over 20 percent per year in 2008-2012.  The customer count went from 25,000 to over 100,000 by 2013.  Growth has continued under the aggressive sales practices described herein, pushing more recent customer accounts to over 125,000 merchants.

20.     The current General Manager of Merchant Services, David Shorten, was National Sales Director for First Data before moving to PNC Merchant Services in 2004.  He then became the head of sales at Merchant Services and led the push to grow the company.  He is now the Senior Vice President and General Manager at Merchant Services.

## JURISDICTION AND VENUE

21.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than New York.

22.     Oddly, Defendant is not registered to do business in New York even though it contractually mandates that all disputes against it be pursued in New York courts.  This Court still has personal jurisdiction over Defendant, however, because it has engaged in a continuous and systematic course of doing business in New York by offering and providing payment processing services to thousands of New York citizens and companies.

23.     Venue lies within this judicial district because Merchant Services mandates that suits against it be filed in Suffolk County, which falls entirely within this district.

## COMMON FACTUAL ALLEGATIONS

### A.     Defendant's High Sales Goals and Inadequate Training Methods Breed Deception.

24.     Defendant obtains merchant customers through its sales team, which is divided into inside sales and outside sales.  The inside sales team consists of sales agents that field sales leads produced by PNC Bank.  For example, tellers are incentivized to mention to business customers of the Bank that they should consider using Merchant Services for their payment processing.  If the business owner or manager expresses interest, their contact information is provided to an inside sales agent, who contacts them by phone and/or email in an effort to make the sale.  Inside sales agents do not make in-person visits to businesses or branches of the Bank. Inside sales agents are paid employees.  They receive a modest base salary and commissions if they achieved sales goals.

25.     Inside sales agents have three goals.  The first is to sell a specified number of "units" per month.  A "unit" is defined as a new merchant account.  For years, this goal was 12 units per month.  It was reduced in 2017 to 10 units for month for reasons discussed below.

26.     The second is for the agent's "units" to produce at least $125,000 in annual net revenue.  In other words, the annual net revenue that Defendant receives from the agent's

merchants (i.e., all fees charged minus pass through fees that must be paid to the card issuers and card networks) must exceed $125,000.

27.     The third goal is that the agent must attain a "Quality Score" of 4.2 out of a possible 5.0.  While the first two goals impacted the inside sales agent's commission revenue, this third goal did not.  An agent's Quality Score is calculated by an employee named Susan King based on her review of two sales calls made by inside agents to prospective merchants in a given month.  These calls were chosen at random.

28.     Ms. King would listen to a call and rate it on a scale of 1.0 (poor) to 5.0 (excellent).  Calls were *not* rated based on the accuracy of the sales agent's communications to prospective merchants.  Indeed, Ms. King has no background in how the payment processing industry actually works, fees are calculated, etc., so she has no foundation to know whether sales agents were misrepresenting facts to prospective customers.  Instead, Ms. King calculated an agent's Quality Score based on factors such as "being nice to the customer."  Thus, agents could omit key facts about fees or outright lie about terms, but so long as they were nice to the customer, they could receive high Quality Scores.

29.     Once a month, Ms. King would have a "Call Listening Session" with inside sales agents where she played what she believed to be an exemplary sales call that achieved a 5.0 score.  Often, these calls were characterized by agents making a sale by withholding key information from the customer.  Inside sales agents joke about how the best way to maintain a high Quality Score is to omit pertinent information (thereby cheating the customer) but do so in a "nice" way.

30.     High Quality Scores kept agents in the good graces of their superiors but did not directly affect commission income.  Rather, an agent's commission was calculated by a

combination of the first two goals, number of units sold and annual revenue, with the unit goal being far and away most important. Agents that sold the most units (often in excess of 40) were lauded by superiors on sales calls despite knowing full well that agents could not possibly make that many sales without taking short cuts.

31.     Until 2017, sales agents attained "Master's Club" status and were eligible for commission income if they met their 12-unit per month sales goal. If this goal was not met, agents were not eligible for any Master's Club commission, regardless of whether they sold 11 units or were on pace to meet their annual revenue goal.

32.     Agents that did meet the 12-unit goal were eligible for a commission bonus of $115 per unit. But the amount of the commission depended on whether the agent was on pace to meet his or her annual revenue goal. For instance, if an agent sold 12 units and was at 80% or more of the annual revenue goal, he or she received the full $115 per unit commission. However, if the agent was not on pace for at least 80% of the annual revenue goal, he or she received a commission of less than $115 per unit, depending on the annual revenue status.

33.     Thus, the most important factor for inside sales agents to earn Master's Club commissions was to sign up as many new accounts as possible. Managers were constantly reminding inside sales agent teams of how many units they had sold in a given month and encouraging them to sell more. One former sales agent said: "management just wanted to get as many units coming in as possible, it didn't matter if they were even profitable because they knew they were going to get screwed later on down the road."

34.     In 2017, Defendant modified its Master's Club eligibility requirements. Defendant did so strictly for liability reasons in response to the Wells Fargo fake account scandal. Defendant was concerned that if it kept commission revenue inextricably tied to the

number of new accounts, it could face a similar lawsuit.  One former agent said:  "they told us the reason was that Wells Fargo was busted for aggressive sales and they wanted to make it look like we were not only going for units even though it was still all about the units."

35.   Defendant, however, made no effort to notify customers that had been signed up based on this program and it did not agree to waive termination fees for such merchants.

36.   As a result of the Wells Fargo scandal, Defendant reduced the unit goal to 10 and allowed agents to make a very small amount of commission revenue even if they did not meet this goal and qualify for Master's Club.  However, this had little effect on agent activities because agents could not make a decent living without qualifying for Master's Club.

37.   The calls of inside sales agents are recorded and saved.  However, these calls are not monitored by management for any reason other than the Quality Score inquiry, which does not account for deceptive sales tactics.  The only way an inside sales agent could get caught lying about a fee or contract term on a recorded line is if the merchant discovered it had been duped and complained.  Even in situations where this occurred, the agent was not reprimanded, rather the merchant was appeased by Defendant through refunds or allowing termination without penalty.  Again, Defendant did not want to discourage agents from selling as many units as possible.

38.   In addition to sales goals, Defendant fostered its culture of deception by providing new sales agents with inadequate training methods.  The official "training" is only a week long and not very in depth.  New agents are taken by management to a sporting event and are told how they can earn commission revenue.

39.   However, before new agents are released to sell on their own, they "shadow" high earning sales agents for a period of six months.  This is where the real training takes place.  New

agents are taught that the only way to make any money is to sell more units and quickly learn the best deceitful tricks to do just that.  This "shadow" training is the equivalent of going to prison and learning to become a better criminal.

40.     Defendant also uses outside sales agents, who work primarily at PNC Bank branches to directly interact with potential customers.  Outside sales agents will also travel to potential customers' places of business.  Outside sales agents are paid a higher base salary and commissions than inside sales agents and are subjected to similar goals and incentives as inside sales agents.  However, because of their ongoing relationship with some customers, they also receive residual payments based on some of the ongoing fees Defendant charges on accounts that they signed up.

41.     The calls of outside sales agents are not recorded.  It is commonly known by Defendant's officers and employees that outside sales agents can and often do say anything to close a deal.  Inside sales agents often complain to management about outside agents "stealing" their sales.

**B.     Agents Do Whatever Is Necessary to Close the Deal.**

42.     The inadequate training and pressure to open accounts has led to a variety of reprehensible sales tactics, described below.  These tactics are all well known to, and endorsed by, Defendant's upper management, including but not limited to Dave Shorten, Norman Haug, and Patty McQuade.

43.     Sales agents pitch the benefits of Defendant's services with prospective merchants and discuss pricing.  If merchants express any interest at all, the agents ask the customer to sign an "Application," telling the customer it is a necessary step to determining whether it is eligible to do business with Defendant and that if the merchant is approved, the agent will be back in

touch to finalize the deal.  This is a bold-faced lie because, once the merchant signs the "Application," the deal has already been finalized.  The "Application" is actually a binding contract and the merchant is stuck doing business with Defendant for a three-year term if it is approved (which virtually all merchants are).

44.     Sales agents do not provide merchants with the fine print terms and conditions governing the parties' relationship before an Application is signed, except on rare occasions. Most of these terms are memorialized in separate documents, including those known as "the Program Guide" and "the Interchange Qualification Matrix."  Combined, these documents often approach *150 pages in length*.  A sample Program Guide and Interchange Qualification Matrix are attached hereto as Exhibits A and B.[2]  These documents are contracts of adhesion drafted by Defendant and offered on a take it or leave it basis.

45.     If merchants were provided these documents and told that Defendant considered them to be binding legal terms, merchants might be scared off because of the length, dense legal text, and use of industry jargon.  For this reason, sales agents intentionally fail to provide these documents to prospective merchants.  The agents know that the fine print of the Application contains a section indicating that the merchant acknowledges receipt of the documents, so even if the agent fails to provide them, the merchant has (falsely) affirmed that they received them and are stuck with their provisions.  Thus, agents often enroll merchants in contracts without providing them the vast majority of terms that govern the contracts, all of which are, of course,

---

[2] It is unknown if these versions are applicable to Plaintiffs' accounts, as Plaintiffs do not have copies of these documents in their files.  Defendant updates these documents periodically and thus several different versions are potentially relevant to this case.  Discovery is needed to confirm the nature and materiality of differences among the various versions of the contractual documents.

ridiculously one-sided in Defendant's favor.  One former agent commented: "I know no one on the inside team sent [the Program Guide] out."

46.     Until recently, the standard contract called for a three-year term that was terminable only upon the payment of hefty penalties of up to $900 ($25 per month x the number of remaining months of the contract), one of the highest early termination fees in the industry. Agents were trained to avoid discussing this term and the fee at all costs.  A former employee has stated: "I don't know any rep that comes out and discloses the early termination fee if it's not prodded out by the customer."  Some representatives even affirmatively lied and said the deal is "cancelable at any time" to sell a unit.  As a result of this fraud, many merchants, including Plaintiffs, were signed up thinking that they could terminate without penalty at any time.

47.     In an August 2017 call with sales agents, as a further element of Defendant's effort to avoid a "Wells Fargo fake account scandal," Dave Shorten announced that Defendant was finally responding to the massive numbers of complaints from customers by removing the early termination fee from new customer contracts.  Merchants previously enrolled, however, would continue to be subject to the fee.  Since the filing of this lawsuit, Defendant has agreed – at least as a matter of internal policy – to allow existing customers to terminate as well without paying the termination fee.  This change has not been effectively communicated to customers and many staffers continue to hide this information from customers.  For example, in August of 2018, Defendant's representatives told Choi's LLC that if it desires to terminate it will have to pay a fee.  This was long after the new policy was purportedly adopted.

48.     Sales agents also knew full well that merchants would pay "junk fees" and markups that were not negotiated and are not described in their Applications.  They were trained

to omit discussion of the fine print term that Defendant may raise fees for any reason, even in some cases affirmatively misrepresenting that all fees are "locked" for a period of time.

49.     By way of example only, the Application indicates that Defendant "reserves the right" to assess a "reasonable" "annual fee" to defray certain costs. Defendant worded the Application this way because it knew merchants would rarely agree to do business if they knew they would definitely be charged a large fee (typically $109.95 per year). Thus, Defendant used this language to lead merchants to believe such fee may not be charged and, regardless, would be limited to reasonable new expenses. Sales agents echoed this fact by telling customers "I can't remember the last time we did that [assessed the fee]" despite knowing full well that the fee was constantly charged every year. Plaintiffs were victims of this scheme.

**C.      Defendant Seeks to Cover Up Illicit Charges.**

50.     After locking merchants into long term agreements, sales agents know that it will not be long before Defendant begins increasing their fees. Indeed, fee increases are a matter of routine practice.

51.     Top management (Mr. Shorten, Ms. McQuade, and occasionally Mr. Haug) hold quarterly (and sometimes more frequent) calls with sales agents to press them to sell more units. During such calls, management often inform agents that "Quarterly Releases" (a/k/a "price releases" or just "releases") are going to occur. These terms are Defendant-speak for fee increases on existing merchants, which are imposed whenever Defendant seeks to increase profits.

52.     As a result of such unilateral increases, agents often received calls from angry merchants they had duped about the new fees. So Defendant designed a way to ward off such complaints before they occur.

53.     After a merchant enrolls, Defendant's sales agents check a box on their computer screens to opt the merchant out of receiving statements through the mail or electronically.  This is known as "suppressing" merchant statements.  Plaintiff Abramoff was subjected to statement suppression at the outset of its relationship with Defendant.

54.     No merchants are advised at the outset of the relationship that their statements are being suppressed, nor would merchants have any reason to agree to such a practice.  Itemized merchant statements serve two important purposes.  First, they disclose what fees are being charged by Defendant and thus enable merchants to discover whether they are being overcharged.  Second, in order to be able to argue that customers have been given advance notice of new or increased fees, Defendant sometimes provides notices of new fees on the statements.  Thus, if customers received the statements they could potentially figure out if and when Defendant was going to impose some of its fee increases.

55.     Without detailed monthly statements, customers are forced to learn of the amounts taken by Defendant by consulting their PNC Bank checking account statements.  These bank statements show amounts debited and credited by Defendant.  No detail is provided so it is impossible for customers to know what specific rates and fees have been assessed, how much each rate and fee is, or whether it is related to a particular transaction.  Defendant takes its fees directly from customer accounts on or about the first or second banking day of each calendar month.  At this time, customers have not been sent any notice of what fees are being deducted.  Even the few customers that receive detailed monthly statements will not receive their monthly statement until a few days later.

56.     Occasionally, merchants complain and demand to be provided processing statements.  However, rather than send a fully detailed itemized monthly statement, Defendant

provides a "summary" statement that is not itemized, and which does not enable merchants to see individual fees and charges necessary to allow them to discover overbilling.

57.     Only if merchants persist are they provided with fully detailed, itemized statements.  For the privilege of receiving such detail, Defendant often adds an additional monthly fee of $6.99 for paper statements and $4.99 for electronic statements.  Thus, to determine whether Defendant is adhering to its contract, merchants have to pay a monthly fee. This is very unusual in the payments industry, where the sending of detailed monthly statements (whether by mail, email, or online) free-of-charge to all customers is the norm.

58.     The statement suppression practice is intended to, and does, keep merchants in the dark concerning Defendant's overcharges and reduce complaints.  Indeed, according to management, only a very small percentage of Defendant's customer base complains about fee increases.

59.     Customers that do realize they have been overcharged typically contact their initial sales agent first.  Agents were told to refer all such callers to the 1-800 customer service line.  The most unscrupulous agents would ignore the calls completely.  Some agents who knew they had cheated customers, however, did make "special requests" to management for refunds.

60.     In the 2015-16 timeframe, management stressed to agents that they were authorizing far too many refunds and the company was losing too much revenue.  So management instructed agents to stop issuing refunds altogether and refer all customer complaints to the customer service department which, for all but the most diligent customers, is a bureaucratic dead end.  Customer service employees were well trained to avoid giving refunds.

61.     Customers that were not satisfied with customer service's response would often demand to terminate.  Defendant would instruct them to send a letter requesting termination

without telling them that an early termination fee would be seized from their checking account for the privilege of terminating.   Only after the merchant called to question the fee would Defendant indicate that it was enforcing the early termination penalty in its contract (which, of course, most merchants do not know exists).

62.     Small business owners have posted innumerable independent reports of Defendant's practices, many of which are similar to Plaintiffs' grievances.   For example, one business posted this in September 2016:

> When I opened my law office I searched for credit card processors. I located PNC and decided to use them because I was informed there would not be a mandatory monthly fee assessed but only transaction costs when the credit cards were used for payment. Several months after I paid $500 for the credit card processing machine I get a letter stating that a $19.50 monthly fee will be assessed beginning in October of 2016. By the letter, the company has unilaterally modified the contract and disadvantaged me by making me incur a fee that I did not expect and was told would not occur. I did receive a credit when I initially paid the $500. I indicated that I had no idea of predicting the gross sales when I signed up for the credit card processing agreement but was told the numbers would not matter. I have requested a refund given the deceitful nature of how PNC Merchant Services treated me and their decision to unilaterally assess a monthly fee on my account.

Another merchant posted this in July 2016:

> We have NEVER actually begun using Merchant Services. But our aggressive sales rep pushed us into getting the whole thing set up (and signing a contract) so we'd be ready when our business was at the point we were going to start accepting credit card payments. We were under the impression the contract wasn't in force until we actually activated the merchant services - but they have been charging us close to $50 a month with all the fees. When we tried to stop it we were treated coldly by their people on the phone and the issue was never resolved. Now, we found someone finally who wants to help but he's advised us to keep paying $15 a month or face more hefty fees. They've been basically stealing our money for a service we have never even used.  Very disappointing.

And another from 2015:

> My company is extremely dissatisfied with PNC Merchant Services. We are unable to close the account with this service due to a 3 year contract. My company is charged many additional fees to the $17.00 per month, and each time we have to call to find out the reason for the fee. At the end of 2014 we were

charged just over $100 labeled as a financial adjustment fee. When I spoke with a customer service agent and asked what it was for, the individual admitted that it was a new charge not on my original contract, but that there was a message about this new charge on an online statement. Since I have never had access to any online statements where I may have seen information concerning this new charge, I insisted this charge be reimbursed. They were able to reimburse the financial adjustment fee after some convincing, but we are going to continue to receive these fees at the end of the year, along with many more. I would not recommend PNC Merchant Services to anyone, and I do not believe that this PNC service acts ethically in charging additional fees outside of a contract. Especially because it is a 3 year contract! If they choose to add additional fees and charges to their services, contract holders in contract prior to the invention of new fees should be grandfathered in, or be exempt from new fees not on the original contract, until the original contract time is up.

These are but a few examples.  Such complaints span several years and are included on numerous small business websites and social media.

63.    Defendant engages in systematic practices of overcharging customers, in violation of both the spirit and letter of the contract, and in contravention of the promises Defendant made to induce customers to enroll in Defendant's services.  This case challenges the nature and amount of the overcharges Defendant imposes as well as the termination penalty Defendant seizes from merchants' bank accounts.

**D.    Defendant Buries Absurd, Unfair, Exculpatory Provisions in the Fine Print of the Program Guide.**

64.    Even if Defendant had provided copies of its Program Guide, Interchange Qualification Matrix, and whatever other contract documents it contends govern merchant accounts, Defendant goes to great lengths to bury critical and unfair contractual provisions in the fine print.

65.    For example, the form Application does not indicate that (a) the various agreed-upon fees and rates will increase (nor would increases be expected since technology and

competition have actually driven down costs for payment processing) or (b) that new, undisclosed fees and rates will be charged.

66.     Instead of conspicuously setting forth such critical provisions in the Application, Defendant buries these exculpatory clauses in the separate, fine print Program Guide – a boilerplate, non-negotiable document.  *E.g.*, Sample Program Guide, p. 2 ("We will not accept any alterations or strike-outs to the Agreement and, if made, any such alterations or strike-outs shall not apply").

67.     Several terms in the Program Guide represent a unilateral effort by Defendant to (a) covertly backtrack from the rates and fees prominently set forth in the Application and (b) immunize itself from liability for improper practices.

68.     For example, the Program Guide purports to give Defendant unfettered discretion "to increase our fees or add new fees for Services for any other reason at any time, by notifying you thirty (30) days prior to the effective date of any such change or addition."  *Id.* at § 11.5.

69.     By way of additional examples, the Program Guide purports to (a) limit the total amount of Defendant's liability to $50,000 or twelve months of fees, whichever is less (*id.* at § 13.4) and (b) waive the merchants' right to a trial by jury (*id.* at § 31.3).

70.     Defendant uses these provisions, as well as the hefty early termination fee (*id.* at Part IV, § A(3)), as tools to discourage aggrieved merchants from terminating their relationships with Defendant or pursuing legal action for overcharges.

71.     Several of the provisions highlighted above, and others, violate public policy, lack mutuality, are illusory, unduly exculpatory, and unconscionable, and are otherwise void and unenforceable pursuant to applicable New York law.

72.     Buried deep in the fine print of the sample version of the Program Guide attached hereto as Exhibit B is the following provision:

> 11.10   You agree to promptly and carefully review your merchant statements or other documents provided or made available to you (physically, electronically, or otherwise provided by Us or others) reflecting Card transaction activity, including, activity in your Settlement Account.  If you believe any adjustments should be made with respect to your Settlement Account, you must notify us in writing within sixty (60) days after any debit or credit is, or should have been effected or such shorter period as provided in the terms and conditions that govern such account.  If you notify us after sixty (60) days, we shall have no obligation to investigate or effect any adjustments.  Any voluntary efforts by us to assist you in investigating such matters shall not create any obligation to continue such investigation or any future investigation.

73.     Defendant claims this provision required Plaintiffs to provide written notice of any overcharges within 60 days of the overcharge.

74.     However, as a preliminary matter, there is no indication that this provision is applicable to each Plaintiff.  As previously noted, the Program Guide attached hereto is but one of several versions.  These provisions may not appear in the Program Guide that is actually applicable to Plaintiffs' accounts, if any.

75.     Even if Section 11.10 (or an equivalent provision) governs, because Plaintiffs were fraudulently induced to enter a contractual relationship with Defendant, the contract is subject to rescission and such provisions are not enforceable.

76.     Section 11.10 also assumes itemized merchant statements that enable merchants to break down their fees and charges are made available to merchants for review.  But Defendant suppresses such statements and only provides them to a select few merchants that vigorously and repeatedly demand to see them.  All merchants like Plaintiff Abramoff whose statements were suppressed by Defendant, or who received summary statements as described above and below, were not on notice that adjustments were necessary, such that they could have possibly given

timely written notice.   Defendants' suppression of statements was done to curb merchant complaints and prevent them from fulfilling their purported duties under Section 11.10 and like provisions.

77.     Moreover, despite purporting to require written complaints to preserve the right to challenge fees, Defendant's corporate practice was to instruct merchants to make *telephonic* complaints to its customer service department.   Indeed, for the limited number of merchants whose statements were not suppressed, Merchant Services included language on the statements that directed merchants to "contact our Customer Help Desk at 1-800-742-5030" if "we can answer any questions regarding the fee or your merchant account."   Thus, despite knowing full well that language buried deep in its own boilerplate contract purports to require complaints to be lodged in writing, month after month Defendant nonetheless consistently directed customers to lodge complaints telephonically, which Plaintiffs did repeatedly.   Defendant may have taken such actions to frustrate customers' performance under Section 11.10 and like provisions but, because it was authorized to change the contract under some circumstances, such notices should be deemed to constitute a change in the complaint procedure.   Defendant knowingly and voluntarily modified or waived the contractual notice requirements.

78.     Despite the actions taken by Defendant to frustrate performance of the written notice requirement, Plaintiffs nonetheless managed to provide written notice to Defendant within 60 days of improper fees.

79.      In addition to their earlier written complaints – which included repeated emails and complaints to governmental authorities that were forwarded to Defendant – Abramoff and Choi's LLC are hereby lodging timely written disputes of improper fees imposed within the 60 days prior to this Class Action Complaint.   Both Plaintiffs are current customers.

80.     Plaintiffs also accepted Defendant's offer or amendment to accept complaints and refund requests via telephone and called Defendant on numerous occasions to complain about the fees they were being assessed.

81.     Thus, even if Section 11.10 is an applicable and enforceable condition precedent, Plaintiffs have provided Defendant with timely, proper notice of their grievances in compliance with Section 11.10 and like provisions.

## INDIVIDUAL FACTUAL ALLEGATIONS

82.     Plaintiffs are current payment processing customers of Defendant.

**A.     Abramoff Law Offices.**

83.     In or about 2014, Abramoff principal Bonnie Abramoff Schmalzer directed her legal assistant to call her local PNC Bank branch to inquire about credit card processing since Abramoff had been a business banking customer of PNC Bank for more than a decade.  Her assistant was transferred four times until she was finally put in touch with one of Defendant's sales agents who described the details of credit card services, which she detailed in a memorandum.  She also provided the agent with an email address where written communications could be sent.

84.     Ms. Schmalzer subsequently asked the agent to put the terms in writing so she could review and confirm.  The agent then sent a draft Merchant Processing Application to sign.

85.     After reviewing the draft Application, Ms. Schmalzer contacted the sales agent directly for further discussion of the terms of service and took notes while she was talking to the agent. Ms. Schmalzer immediately noted some errors on the Application, including that assumptions the agent had made regarding her anticipated volume and usage were incorrect.  She

asked for these errors to be corrected. The agent indicated that no correction was necessary to this data but he did correct the application as to customer tax information.

86. Ms. Schmalzer also expressed concern that the Application was difficult to understand. The agent explained that if Abramoff enrolled in services with PNC, it would pay a rate of 1.39% for MasterCard, Visa, and Discover transactions plus an assessment fee of .11% for a total rate of 1.5% for all swiped transactions. Ms. Schmalzer was also informed that if a transaction had to be keyed in, as opposed to swiped, an additional .6% would be charged, for a total rate of 2.1% and that debit card transactions would be a "35 cent flat fee." Ms. Schmalzer was also told that "none of the other fees on the fee transaction charts will come up for [her]." The agent further confirmed for her that there were no start-up or billed fees, as indicated on the form.

87. Eventually, a corrected Application was prepared and sent to Ms. Schmalzer. *See* Abramoff Application. This Application appeared to comport with Ms. Schmalzer's conversations with the sales agent. The Visa, MasterCard, and Discover rate is listed at 1.39%, the additional .6% "non-qualified surcharge fee" is noted, as is the .11% assessment fee. There were other additional fees noted but Ms. Schmalzer assumed the agent was telling the truth when he told her "none of the other fees on the service fee transaction charts will come up for [her]." She saw that the Application contained her email address at which her statements were to be sent.

88. On or about August 15, 2014, Ms. Schmalzer digitally signed the Application. *See* Abramoff Application (Exh. C). She began to process transactions through Defendant after she received the terminal that she had leased through Defendant under the terms they required.

89.     After Abramoff's account was opened, it did not receive any monthly statements from Defendant.  However, the lump sum amounts being deducted from Abramoff's bank account by Defendant were not obviously excessive, so Abramoff assumed Defendant was operating pursuant to the contract.  The debits taken from Abramoff's account were labeled in such a fashion to make it seem as though they were legitimate (e.g., "PNC MERCHANT FINCL ADJ" of $109.95).  Since commencing service, Abramoff received several letters by mail from Defendant reporting nominal adjustments for rates and fees and falsely assumed these were the only changes to the charges for her transactions.

90.     Abramoff was a victim of Defendant's practice of opting merchants out of receiving monthly statements to prevent them from ever receiving statement notices or understanding the nature of the fees being charged.

91.     In November 2017, Ms. Schmalzer received a "courtesy call" from Defendant to see if she was satisfied with the services she was receiving.  Ms. Schmalzer responded that she really had no way of knowing if Defendant was charging her correctly because she never received any itemized statements.  The caller said she could not help with this.

92.     In late February 2018, Abramoff contacted Defendant's customer service department to inquire as to why it had never received an itemized monthly statement.  Abramoff was advised that the agent who enrolled it had opted it out of receiving statements and that the only way to see statements was to access them online.  The customer service representative explained that if Abramoff wanted mailed or emailed statements sent, it would have to pay a $6.99 or $4.99 monthly fee, respectively.

93.     After much effort, including meeting with a PNC branch manager and a PNC Merchant Services Account Executive in person and working by phone with merchant services

personnel, Abramoff was finally able to get access to all itemized monthly statements online and was assured that she would receive monthly statements by email going forward.  The statements revealed multiple instances of overcharges and multiple increases in rates.

94.     Most notably, in September 2015, September 2016, September 2017, and most recently in September 2018, Abramoff was charged a $109.95 annual fee.  *E.g.*, September 2018 Statement (Exh. D hereto).  This fee is not identified in the Application as a fee Abramoff would pay, nor was it mentioned in the initial sales pitch.

95.     Even if Abramoff's statements had not been suppressed, PNC hides the fee in the dense text of the monthly statement.  Rather than label the annual fee as a "fee" like every other fee charged and disclose it in the section of the statement marked "FEES," Merchant Services labels it as an "adjustment" and discloses it in the section marked "ADJUSTMENTS."  *Id.* at 2.

96.     According to the statement, the "ADJUSTMENTS" section reflects "[t]he amounts credited to, or deducted from, your account to resolve processing and billing discrepancies."  *Id.*  The annual fee in no way meets these criteria.  Rather, the annual fee is clearly a fee and belongs in the "FEES" section, which discloses "fixed amounts charged for specific processing services."  *Id.*  The nature of this improper fee was also fraudulently depicted on the PNC Bank statements of Abramoff as a "FINCL ADJ."

97.     By hiding the annual fee in the inapposite "ADJUSTMENTS" section, Merchant Services is able to distract the attention of merchants that are focused on the fees they are being charged.  This tactic minimizes complaints, demands for refunds, regulatory oversight, and legal challenges.

98.     Although Defendant reserved for itself discretion to add "a reasonable [annual] fee to defray the cost of necessary systems technology upgrades, communication requirements

and reporting," the agent told Abramoff such fees "would not come up for [her]."  This did not conflict with the Application, which indicates the fee is discretionary.

99.     Although PNC has charged the annual fee to all merchants for years and knows full well at the time a merchant enters into an agreement that its systems are programmed to charge this fee, Merchant Services nevertheless intentionally words the Agreement to make it seem as though the annual fee may not be assessed.  This language gives agents wiggle room to lie to prospective merchants and tell them that the fee "would not come up for you."

100.     Moreover, the $109.95 annual fees charged are neither "reasonable" nor were they needed to defray "necessary" costs.  Abramoff Application, p. 3.  Rather, they were imposed as a planned "release" strictly to pad Defendant's bottom line at Abramoff's expense.  That the amount charged has been the same for years shows the fees are not dependent on changing costs or requirements, as such factors are not uniform on a year-to-year basis.

101.     This fee results in annual proceeds of over $15,000,000 for Defendant.  Since First Data, not Defendant, handles all back-office processing for Merchant Services, and the same systems are shared by hundreds of other companies – such as Bank of America Merchant Services and Wells Fargo Merchant Services – there are no actual "necessary costs" that would allow Defendant to charge this fee.  In fact, no costs are being defrayed – as is required by the contract – but rather the proceeds from the annual fee travel straight to Defendant's bottom line.

102.     Additionally, the Application indicates that annual fees, if they were to be assessed, would only be assessed "with at least 30 days advance written notice."  Abramoff Application, p. 3.  The annual fees charged to Abramoff were not assessed "with at least 30 days advance written notice."

103.     For instance, Defendant purported to notify Abramoff on its August 2018 card processing statement that an annual fee would be assessed "on or after September 1, 2018." *See* August 2018 Statement (Exh. E hereto).  The August 2018 statement was not made available to Abramoff until September 6, 2018, yet the fee was assessed on September 22.  *See* September 2018 Statement, p. 2.

104.     Even if one looks at the date Merchant Services removed the fee from Abramoff's account, as opposed to the date Merchant Services assessed the fee, 30 days advance notice was *still* not provided, as the fee came out of Abramoff's account on October 2, 2018 (i.e., less than 30 days after the statement was made available to Abramoff on September 6, 2018).  The same type of untimely advance written notice occurred on the annual fees charged to Abramoff in 2015, 2016, and 2017.

105.     In addition to the improper annual fees, on its August 2018 statement, which was not received until September 6, 2018, Defendant assessed the following fees on Abramoff:

| | |
|---|---|
| JUL BB080-TRANSACTION CLEARED AT SIGNATURE PEREFERRED CP VI 1 | $1.19 |
| JUL BB091-INVALID POS ENTRY MODE FOR PROGRAM MC 1 | $34.34 |
| JUL BB190-TRANSACTION CLEARED AT REWARDS 2 SIG VI 1 | $15.60 |
| JUL BB182-TRAN CLEARED AT CPS CARD NOT PRESENT DEBIT/PR VI 1 | $34.37 |

106.     Abramoff has no idea what these entries even mean.  They are not tied to any specific credit card transactions nor is there any explanation as to how these charges were calculated, which prevented Abramoff from ascertaining exactly what they are for.  They are certainly not consistent with any of the charges on Abramoff's Application, nor was Abramoff provided with any notification that these fees were being added to its account.  All such fees violate Defendants' contracts with customers.

**B.**   **Choi's Beer Shop, LLC.**

107.   Choi's LLC signed up for card processing services through Defendant in July 2017.

108.   Before enrolling, Choi's LLC put the sales agent Rodrigo Jimenez on notice that it did not want to bound to a long-term deal.  Indeed, when Mr. Jimenez tried to get Choi's LLC to enroll in a lengthy non-cancellable lease with First Data for a terminal, Choi's LLC decided to buy the terminal just so it would not be locked into a long-term deal.

109.   Despite knowing Choi's LLC did not want to be bound to a long-term deal, Mr. Jimenez signed Choi's LLC up to a three-year term with a hefty early termination penalty without telling Choi's LLC about the term.  Notably, this was less than one month before Defendant decided to stop the practice of binding merchants to long-term deals altogether.

110.   Nor could Choi's LLC reasonably discern the existence of such a term before entering a relationship with Defendant.  After agreeing upon the rates to be charged, Mr. Jimenez presented Choi's LLC with a tablet and asked for a signature.  It was only after Choi's LLC signed the tablet and began doing business with Defendant that it learned about the term and the dozens of pages of fine print contractual terms, which were never presented before Choi's LLC signed.

111.   After enrolling, Choi's LLC actually received statements from Defendant and reviewed them monthly.  It often encountered fees it did not understand and made repeated calls to Defendant's customer service department to try to understand the fees and obtain refunds of those it thought to be improper.

112.   Occasionally, Choi's LLC would obtain some relief from customer service but usually it was a dead end.  The responsiveness of Defendant's customer service was so poor that

Choi's LLC felt it had no choice but to lodge a complaint with the Office of the Comptroller of Currency, which it did.  The case was assigned Case Number 3172018.  This complaint was forward to Merchant Services which issued a response.

113.     Nevertheless, Defendant has continued to impose unauthorized charges on Choi's LLC.  Most notably, in September 2018, Choi's LLC was charged a $109.95 annual fee, which was buried in the "ADJUSTMENTS" section of its statement.  According to the Application, such fee would only be charged "to defray the cost of necessary systems technology upgrades, communication requirements and reporting."  The nature of this improper fee was also fraudulently depicted on the PNC Bank statements of Choi's LLC in an attempt by Defendant to deflect attention and avoid complaints, refunds, and regulatory oversight.

114.     As described above with regard to Abramoff, the $109.95 fee charged to Choi's LLC was not needed to defray "necessary" costs.  Choi's LLC Application, p. 3 (Exh. F hereto).  Rather, it was imposed as a planned "release" strictly to pad Defendant's bottom line at Choi's LLC's expense.

115.     Additionally, the Application indicates that annual fees, if they were to be assessed, would only be assessed "with at least 30 days advance written notice."  Application, p. 3.  The annual fee charged to Choi's LLC was not assessed "with at least 30 days advance written notice."

116.     Defendant purported to notify Choi's LLC on its August 2018 card processing statement that an annual fee would be assessed "on or after September 1, 2018."  *See* August 2018 Statement (Exh. G hereto).  The August 2018 statement was not made available to Choi's until September 4, 2018, yet the $109.95 fee was assessed on September 22.  *See* September 2018 Statement, p. 2 (Exh. H hereto).

117.     Even if one looks at the date Merchant Services deducted the fee from Choi's PNC Bank account, as opposed to the date Merchant Services assessed the fee, 30 days advance notice was *still* not provided, as the fee came out of Choi's LLC's account on October 2, 2018 (i.e., less than 30 days after the statement was made available to Choi's LLC on September 4, 2018).

118.     As a consequence of Defendant's fraudulent, unfair, and improper policies and practices, Plaintiffs and the members of the proposed classes have been wrongfully forced to pay unauthorized fees and charges, including as set forth herein.  Defendant has improperly deprived Plaintiffs and those similarly situated of significant funds, causing ascertainable monetary losses and damages.

119.     The improper fees and charges described herein are illustrative only and are not intended to provide a full listing of the improper fees paid by Plaintiffs or the members of the proposed classes.  Indeed, as previously noted, Defendant never sent certain customers monthly statements and the monthly statements it did send did not contain sufficient information, thus making it impossible for Plaintiffs to discover the nature and amount of all overcharges.

120.     After initial discovery, Plaintiffs will be in a position to detail all overcharges.

## CLASS ALLEGATIONS

121.     Plaintiffs bring this action on behalf of themselves and all others similarly situated.

122.     The classes are preliminarily defined as:

All United States customers of PNC Merchant Services that were assessed an annual fee (the "Annual Fee Class").

All United States customers of PNC Merchant Services that were assessed a non-pass through monthly fee that is not identified in the service fee schedule of their contract (the "New Monthly Fee Class")

123.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate and as the Court may otherwise allow.  It is very likely that additional classes or subclasses will be appropriate.

124.     Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

125.     The time period for the Classes are the number of years immediately preceding the date on which the Complaint in *Healing for the Abused Woman Ministries, et al. v. PNC Merchant Services Co., L.P.,* Civil Action File No. 1:17-cv-06255-NGG-CLP (E.D.N.Y.), was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.  All of Defendant's contracts mandate that New York law be applied.  New York imposes a six-year statute of limitations on breach of contract actions.

126.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can meet all the applicable requirements of Federal Rule of Civil Procedure 23 and can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

127.     **Numerosity.**  The members of the Classes are so numerous that individual joinder of all the members is impracticable.  There are over 100,000 merchants that have been damaged by Defendant's wrongful conduct as alleged herein.  The precise number of Class members and their addresses is presently unknown to Plaintiffs but can readily be ascertained from Defendant's books and records.  Class members may be notified of the pendency of this action

by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

128. **Commonality and Predominance.** Numerous common questions of law and fact exist as to the claims of Plaintiffs and the other Class members. Such questions include, but are not limited to:

(a). Whether Defendant acted and continues to act fraudulently in inducing merchants to contract with Defendant;

(b). Whether Defendant acted and continues to violate its contract with merchants by assessing improper fees;

(c). Whether, to the extent Defendant's overcharges do not violate express provisions of the merchant agreement, they violate the covenant of good faith and fair dealing;

(d). Whether Defendant is liable to Plaintiffs and the other Class members for imposing improper fees on merchants for Defendant's own benefit;

(e). Whether certain contractual provisions in Defendant's form merchant agreements are invalid exculpatory clauses, violate public policy, lack mutuality, are illusory, are procedurally and substantively unconscionable, and are otherwise void and unenforceable;

(f). The proper method or methods by which to measure damages and/or restitution; and

(g). Whether Defendant should be enjoined from engaging in any or all of the improper practices complained of herein.

129. Defendant has engaged in a common course of conduct toward Plaintiffs and the other Class members. The common issues arising from this conduct that affect Plaintiffs and the

other Class members predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

130.     **Typicality.**  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories.   Further, Plaintiffs and the members of the Classes were comparably injured through the uniform misconduct described above.

131.     **Adequacy of Representation.**   Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

132.     **Declaratory and Injunctive Relief.**  Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.  Specifically, Defendant continues to knowingly overbill the Classes and utilize unenforceable contractual provisions in order to block the Class members from seeking legal relief.   Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

133.     **Superiority.**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendant, thus rendering it impracticable for Class members to individually seek redress for Defendant's

wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**COUNT ONE**
**Breach of Contract and Breach of the**
**Covenant of Good Faith and Fair Dealing**

134.     Plaintiffs repeat paragraphs 1 through 133 above.

135.     Plaintiffs and the Class members each entered into form contracts with Defendant.

136.     The actions taken by Defendant have materially violated the specific terms of these form contracts, such as by:

(a).     charging annual fees that are unreasonable and/or greater than necessary to "defray the cost of necessary systems technology upgrades, communication requirements and reporting";

(b).     charging annual fees without providing proper advance notice; and

(c).     charging additional fees that were not specified in the Application, violated the conditions placed on such fees by the Application or were specified in lesser amounts in the Application, and without providing required advance notice.

137.     Further, through its conduct alleged herein, Defendant has separately breached its form contracts with Plaintiffs and the Class members by exercising the discretion afforded by its contracts [including Sections 11.4 and 11.5 of the Program Guide (or equivalent provisions)] to raise fees or add new fees, such as annual fees in violation of the covenant of good faith and fair dealing.

138.    Defendant's post-contract discretionary fee manipulations far exceed what Plaintiffs and the Class members reasonably expected and were led by Defendant and its agents to expect.  This conduct by Defendant was arbitrary and in bad faith.

139.    The good faith and fair dealing claim is brought in the alternative to Plaintiffs' direct breach of contract claims [¶¶ 136(a)-(c)].  Specifically, if Defendant is determined to have the contractual discretion to charge Plaintiffs different fees than those specified in the applications such that the complained of fees are not direct breaches, Defendant nonetheless breached the covenant of good faith and fair dealing by charging such fees.

140.    Defendant's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and the Class members the full fruits of their bargains with Defendant.

141.    Plaintiffs and the Class members have performed all conditions precedent to suit and all, or substantially all, of the other obligations imposed on them under the contracts.

142.    Defendant's breaches of contract have resulted in damages sustained by Plaintiffs and members of the Classes.

143.    Defendant's anticipated attempts to defend its overcharging through reliance on fine print contractual provisions in the Program Guide and elsewhere will be without merit. Such provisions are either inapplicable or are unenforceable because they are void, illusory, lack mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and are unenforceable in light of the hidden nature of Defendant's misconduct, among other reasons.  These provisions do not excuse Defendant's breaches or otherwise preclude Plaintiffs and the Classes from recovering for such breaches.

144.     Plaintiffs and the Class members have sustained damages as a result of Defendant's direct breaches of the contract and separate damages as a result of Defendant's breaches of the covenant of good faith and fair dealing.

**COUNT TWO**
**Fraudulent Inducement**

145.     Plaintiffs repeat paragraphs 1 through 133 above.

146.     As alleged herein, Defendant concealed (and continues to conceal) its true fee practices, and intentionally and fraudulently induced Plaintiffs and the Class members to enter into contracts with Defendant through its material omissions and material affirmative promises of fee terms that Defendant never had any intention to honor.

147.     Defendant knew that its pre-contract disclosures did not accurately reflect the prices and fees it would ultimately charge merchants, including Plaintiffs and the other Class members, at the time the terms were provided to such merchants.

148.     For instance, at all relevant times, Defendant knew it would invariably impose an annual fee of $109.95 on new merchants and eventually add monthly fees to new merchants that were not reflected in their Applications.  Rather than make such intent known, Defendant used wishy-washy language in the Application and outright lies from sales agents to induce merchants into signing the contract.

149.     Defendant also intentionally misled merchants into believing that they were binding themselves to a contract with a lengthy term and early termination penalty.  As previously noted, it was the common practice of Defendant's agents to affirmatively misrepresent and/or conceal the existence of these key provisions from prospective merchants.

150.     Defendant made the foregoing misrepresentations and omissions of present fact alleged herein to induce Plaintiffs and the other members of the Classes to rely on them.

151.     Defendant's misrepresentations and omissions alleged herein were material, including in that they would be considered very important to merchants in deciding whether or not to do business with Defendant, and were known by Defendant at the time to be false and misleading.

152.     Defendant's true pricing terms and model included additional unmentioned or obscured fees.

153.     Prior to executing Applications and forming a contract with Defendant, Plaintiffs and the other Class members were deceived by Defendant with respect to its fee practices.

154.     The nature and amounts of fees that would actually be charged, as represented by Defendant at the time of merchant enrollment (including in the in the Application), were material to and justifiably relied upon by Plaintiffs and the other Class members.  Had Defendant accurately represented its true fee practices to Plaintiffs and the other Class members, and not misrepresented, obscured, and concealed them, Plaintiffs and the Class members would not have contracted with Defendant to receive payment processing services.

155.     Accordingly, Plaintiffs and the other Class members were fraudulently induced to enter into contracts with Defendant.

156.     Plaintiffs are entitled to seek damages and/or rescission of their contracts with Defendant, or other equitable relief, including restitution of funds Defendant took from them without permission.

157.     Plaintiffs will make any necessary election of remedies at the appropriate juncture.

### COUNT THREE
### Unjust Enrichment

158.     Plaintiffs repeat paragraphs 1 through 133 above.

159.     Plaintiffs and all Class members assert a common law claim for unjust enrichment.  This count is brought only in the alternative and is contingent on relevant provisions of Defendant's form contracts with Plaintiffs and the Class members being deemed ineffective, inapplicable, void, or unenforceable as to one or more claims stated herein.  In such scenario, unjust enrichment will dictate that Defendant disgorge its ill-gotten gains.

160.     As alleged herein, Defendant was unjustly enriched at the expense of Plaintiffs and the other members of the Classes, who were grossly and inequitably overcharged by Defendant.

161.     Plaintiffs and the other members of the Classes were unjustly deprived of money obtained by Defendant as a direct and proximate result of its undisclosed, deceptive, unfair, unscrupulous, and unconscionable fee and billing practices alleged herein, including through the assessment of fees that Defendant had no lawful right to collect.

162.     It would be inequitable and unconscionable for Defendant to retain the profit, benefit, and other compensation obtained from Plaintiffs and the other members of the Classes as a result of its wrongful conduct alleged herein.

163.     Plaintiffs and the other Class members are entitled to seek and do seek restitution from Merchant Services as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendant by virtue of its wrongful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the proposed Classes demand a jury trial on all claims so triable and judgment as follows:

1.     Certifying this case as a class action pursuant to Federal Rule 23;

2.      Temporarily and permanently enjoining Defendant from continuing the improper business practices alleged herein;

3.      Granting rescission of the contracts;

4.      Declaring certain contractual provisions to be unenforceable and enjoining their enforcement;

5.      Awarding restitution of all improper fees seized by Defendant from Plaintiffs and the members of the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

6.      Awarding actual, compensatory, general, nominal, punitive, and exemplary damages as allowed by law in an amount to be determined by a jury;

7.      Awarding pre-judgment interest at the maximum rate permitted; and

8.      Awarding such other relief as this Court deems just and proper.

DATED this 22nd day of October, 2018.

Respectfully submitted,

BY:    WEBB, KLASE & LEMOND, LLC

*/s/ E. Adam Webb*
E. Adam Webb
 Georgia Bar No. 743910

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com

*Attorneys for Plaintiffs*